UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| PAMELA REIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-3425 |
| | ) | |
| QUINCY PUBLIC SCHOOL | ) | |
| DISTRICT #172, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

This matter is before the Court on the Motion for Summary

Judgment filed by Defendant Quincy Public School District #172

("Defendant") against its former employee and now Plaintiff, Pamela

Rein ("Plaintiff"). Because genuine issues of material fact exist,

Defendant's Motion for Summary Judgment is DENIED.

## I.     FACTUAL BACKGROUND

Between the ages of 54 and 55, Plaintiff Pamela Rein applied for six

administrative positions in the Quincy Public School District. Despite

her administrative qualifications and 19-year history with the District,

Plaintiff was not hired for any of these positions. It must be because of my age, she thought, and filed this suit under the Age Discrimination in Employment Act, alleging that Defendant discriminated against her because of her age.

Nearly all of Pamela Rein's educational experiences—as a student, teacher, and principal—have occurred in or around Quincy, Illinois. Plaintiff attended Quincy High School and graduated with a bachelor's degree in special education from Western Illinois University. She earned her Master's Degree in elementary education and later obtained an administrative certification from Quincy University. In 2009, while working in the Quincy School District, Plaintiff was awarded a superintendent certificate after completing a two-year program at Western Illinois University.

Years before becoming Plaintiff, Pamela Rein was Principal or Director of Irving Alternative School, which had previously been known as the 14th Alternative School, in Quincy, Illinois.[1] She held that position from 2004 to 2010 when, depending on which party is asked,

---

[1] As Assistant Superintendent Christie Dickens explained, the Alternative School had a "Director" who had the same duties as a Principal—there was no difference between the two titles. See Dickens Deposition, d/e 34-5 at 39.

the school was either "closed" or "outsourced." The Irving Alternative School is exactly as it sounds: it is an alternative to Quincy High School for the students who were struggling academically or behaviorally there. Prior Superintendent Lonny Lemon, a key witness in this case, has described students at Irving as those who were emotionally, socially, or academically "at risk." Lemon Deposition, d/e 34-6 at 29-30. There were also students with behavioral issues who were in trouble with the law and missed school. Id. at 30. According to Mr. Lemon, "truancy was a huge factor" at Irving. Id. at 31. Mr. Lemon explained that "truancy" is defined by the state and that at the relevant time, a "chronic truant" was a student who missed 10 percent of his classes. Id. at 33-34 (explaining that in the past few years the state legislature has decreased the percentage from 10 to five). Irving students had lower graduation rates than their counterparts in the mainstream Quincy High School. Id. at 31.

Safety was an additional problem at Irving School. In or around 2008, at least two security guards policed the Irving grounds. Plaintiff later asked for "more staff" due to, in Mr. Lemon terms, "extreme issues with kids." Lemon Deposition, d/e 34-6 at 45.

## 1. Plaintiff's Positive and Negative Evaluations as Principal

Around 2008, when the Irving School opened, a Pre-Evaluation Reflection and Feedback form indicated that Plaintiff was succeeding in her position as Principal. This Pre-Evaluation form included Plaintiff's goals based on six state standards and feedback on those goals and Plaintiff's performance from the "Central Office Administrative Team," ("Central Office") which consisted of the superintendent at that time, Tom Leahy, and Assistant Superintendents Patricia Sullivan-Viniard and Christie Dickens. The below snapshots of the feedback on the Pre-Evaluation form show the Central Office praising Plaintiff's work as Principal of Irving:

> We agree now that you have done a superb job of establishing the culture and climate for supporting at risk students, and the next—the most important—step is to ensure that the students who work and learn in that environment receive a quality, rigorous instructional program.

> You are very organized and utilize effective problem-solving skills on a daily basis. Your demeanor, work ethic and flexibility all serve you well as you work to manage the at-risk teens in your building and the staff who support them.

> The Central Office Administration commends you, Pam, for your natural talent to work warmly, cooperatively

and collaboratively with parents/guardians in the most challenging circumstances . . . . Your calm, welcoming, non-judgmental and genuine demeanor puts all around you at ease.

The Central Office administration observes you consistently being an educational leader who promotes the success of all students by understanding, responding to, and influencing the larger political, social, economic, legal, and cultural context.

Lemon Deposition, Exhibit 1, d/e 34-6 at 175-80.

Ms. Sullivan-Viniard prepared this pre-evaluation form after collaborating with Mr. Leahy, the superintendent who preceded Mr. Lemon, and Ms. Dickens.  See Sullivan-Viniard Deposition, d/e 34-4 at 33.  Mr. Leahy's participation dates the evaluation to some time prior to 2008, when Mr. Lemon became superintendent.  Id.  According to Ms. Sullivan-Viniard, the Central Office's feedback was based on discussions with students and staff at Irving, staff surveys, and the Central Office Administration's personal observations of Plaintiff.  Id.

This Pre-Evaluation form created by Plaintiff, former Superintendent Mr. Leahy, Ms. Sullivan-Viniard, and Ms. Dickens is a stark contrast to the evaluation Plaintiff received in January of 2010 when Mr. Lemon led the Central Office as Superintendent.  Although the

Central Office praised Plaintiff's "ability to collaborate with families" as a "leadership strength" and stated that her work with the "Truancy task force has been notable," other comments in the review are critical, as the below sample shows:

> You have been unsuccessful in facilitating a vision of learning for the students, staff, and faculty of Irving.
>
> Feedback to Central Office through meetings, surveys, and personal conversations with faculty and staff at Irving shows a prevalent belief that students are not disciplined in a fair and consistent manner.
>
> A number of the above issues were addressed with you by [Mr. Lemon] and Mrs. Dickens in meetings held on 11-17-08 and 1-7-09. Further, you set as goals for the 2009-10 school year to address issues of attendance, behavior and changes in the behavior rubric. Yet these areas continue to be issues of concern this year and we have little to no evidence that you have addressed them, created new action plans or implemented substantive changes in current practices and policies.
>
> To summarize, Central Office has great concerns that there has been no significant improvement in the culture of Irving School . . . . We are not seeing the results we expected from your building . . . . There is minimal evidence that you have assisted your faculty and staff to create an atmosphere of learning at Irving Alternative.
>
> Culture and climate assessment by you, in consultation with your staff, should have brought response and implementation of change to correct student behavior,

attendance, and academic accountability. We do not have any indications of this occurring.

The academic climate at Irving currently does not meet District standards and expectations.

You have yet to convey any Irving action plan to address your truancy problem.

Lemon Deposition, Exhibit 6, d/e 34-6 at 189-93.

Some point after receiving this negative evaluation, Plaintiff wrote a rebuttal in which she contested many, if not all, of these critiques. See Lemon Deposition, Exhibit 5, d/e 34-5 at 195-97. In her rebuttal, Plaintiff disputed the allegation that she overruled discipline given by staff, stating it is "simply not true" and that other examples of her taking such action are "grossly exaggerated." Id. at 195. She also asserted that attendance had improved at the school and noted that "change takes three to five years." Id. at 196. Plaintiff additionally challenged the blame the Central Office placed on her for the students' poor performance on state-administered annual tests:

The students who come to Irving have had a history of school failure both academically and socially. To hold an administrator accountable for [the annual test] results is ridiculous. How many of these students have spent more than a few months in the Alternative Program before testing? What were the typical test

scores for these students prior to entering the
Alternative Program?

Id.

Affidavits submitted by Terry Ellerman, the former Principal at
Quincy High School who "worked closely" with Plaintff, and Dinah
Harris, a counselor at Irving, support the points Plaintiff made in this
rebuttal. See Ellerman Affidavit, d/e 38-3; Harris Affidavit, d/e 38-4.
Mr. Ellerman attests that Plaintiff worked with teachers "to provide a
strong program" and "continued to increase the academic rigor of the
program" at Irving. Ellerman Affidavit, d/e 38-3 ¶ 3. According to Mr.
Ellerman, Plaintiff helped "many students succeed and graduate from
Quincy High School." Id. Ms. Harris is equally complimentary and
specifically mentioned that Plaintiff "did institute a program to address
the students' use of profanity" that decreased the profanity at Irving.
Harris Affidavit, d/e 38-4 ¶ 3. Ms. Harris also stated that while it was
true many teachers at Irving were stressed, the stress was "because of the
students' conduct, not because of Pam Rein." Id. ¶ 7. Regarding the
Irving curriculum, Ms. Harris notes that "we were beginning to make
important steps in reaching a goal of a strong curriculum." Id. ¶ 8. She

also mentions, however, that "with the particular student population," the goal of a strong curriculum is "not always reachable." Id.

In Plaintiff's own affidavit she states that after receiving her negative review in 2010, she met with Mr. Lemon and asked whether he was going to fire her. Rein Affidavit, d/e 38 ¶ 2. According to Plaintiff, Mr. Lemon said that she "could resign." Id. Defendant states that this offer to resign "was included in correspondence regarding [Plaintiff's] poor performance review and subsequent outsourcing to Ombudsman of the alternative school program." Defendant's Reply to Plaintiff's Response to Motion for Summary Judgment, d/e 49 at 41.

So why this dramatic change in the Central Office's view of Plaintiff's work as Principal between 2010 and 2012? Each party has a different answer to this question, and each party uses that answer to explain why Plaintiff was rejected from the six administrative positions for which she subsequently applied. Plaintiff attributes the change to the Central Office's quest to push her into retirement. She argues that her age, in addition to the high salary she would fetch as an experienced and qualified educator in the District, are the reasons the Central Office did not hire her for any of the administrative positions. Plaintiff's theory,

according to her Response to Defendant's Motion for Summary Judgment, is that Defendant created this poor evaluation of Plaintiff rather than moving her to an open position at another school after Irving closed, because of Plaintiff's age.

Defendant, on the other hand, contends that after 2008, Irving staff increasingly complained to the Central Office about the lack of security and discipline at the school and blames Plaintiff for the students' high truancy rates and bad behavior, including a rampant use of profanity and calling teachers by their first names. The Central Office also faulted Plaintiff for the students' poor performances on annual exams administered by the State of Illinois. Although some in the Central Office considered Pam an "educational leader" around 2008, the discipline and safety issues began to slowly change their assessment. See Sullivan-Viniard Deposition, d/e 34-4 at 42. The Central Office contends that by the end of her tenure at Irving, she was not an effective "educational leader." Id.

### 2. Interactions between Plaintiff and Superintendent Lemon from approximately January 2010 to June 2010

It was not only the fact she was in her mid-50s that made Plaintiff question the true motives behind the District's decisions not to hire her; Plaintiff's interactions with Mr. Lemon from January 2010 onward have led her to believe that the District, and specifically Mr. Lemon, wanted her to retire.

The first of these interactions was a meeting Plaintiff had with Mr. Lemon in or around January 2010, *before* Plaintiff received the negative evaluation. Mr. Lemon and Plaintiff recall the conversation they had at the meeting somewhat differently. Plaintiff contends that the purpose of her meeting was to review her evaluation and discuss her goals for Irving. Rein Deposition, d/e 34-1 at 79. Plaintiff testified that at the beginning of the meeting, she and Mr. Lemon made small talk—what's happening, how are you, etc. Id. Plaintiff then recalls that she referenced her goals and told Mr. Lemon that she had been working on and readjusting them. According to Plaintiff, Mr. Lemon "then just in conversation said, 'So when do you plan to retire?'" Id. at 80. Plaintiff responded that she did not have plans to retire and wanted to continue working in the

alternative program.  Id.  Apparently, Mr. Lemon then started talking about the cost of his own retirement compared to Plaintiff's cost and noted that because of her experience in public education, Plaintiff "was in a much better situation to retire than he would be," or in other words, that "it would be much easier" for Plaintiff to retire than for Mr. Lemon. Id.  Plaintiff also stated that Mr. Lemon indicated that he would retire as soon as he was eligible.  Id. at 82.  Plaintiff emphasizes that Mr. Lemon never discussed her goals with her: "He didn't even look at them." Id. at 81.

Defendant disputes the accuracy and materiality of much of Plaintiff's account of this conversation.  In Defendant's Reply to Plaintiff's Response to Summary Judgment, Defendant cites Mr. Lemon's deposition to support the claim that "Mr. Lemon does not agree that he asked Plaintiff she planned to retire in the words used by the Plaintiff." d/e 34-6 49 at 9.  The corresponding page of the transcript cited to, however, shows not that Mr. Lemon disputes the question, but that he does not remember asking it:

> Q. Well, I'm asking. Did you ask Pam Rein
>    in January of 2010 when she planned to retire?

A. I don't recall. I remember a conversation I'd be glad
    to explain.

        *               *               *

Q: So are you denying that you asked her
    that question; when she planned to retire, in
    January of 2010?
A. I remember the conversation. I don't
    recall asking her that specific. I remember the
    context of our conversation. I don't remember
    that was the specific question I asked.

Lemon Deposition, d/e 34-6 at 96-97.

In his deposition, Mr. Lemon went on to explain the conversation

with Plaintiff as "friendly" and "casual."  Id. at 98, 100.  According to

Mr. Lemon, when he learned in their meeting that Plaintiff had taught

on an Indian Reservation, he thought he was in a "similar position"—

"We're kind of in the same boat"—because he had also worked in a job

outside of the state school system.  Id. at 99.  Mr. Lemon testified that

he asked Plaintiff whether she received credit in the Teachers Retirement

System for teaching on an Indian Reservation because he had not

received credit for his "independent job" at a parochial school.  Id. at 98.

He apparently then told Plaintiff that he had to "work longer" to get a

full pension.  Id. at 99.  Mr. Lemon testified that he does not "even

remember what she said" when he asked Plaintiff about these credits. Id. Regarding the goals Plaintiff brought with her to the meeting, Mr. Lemon testified that he could not remember the purpose of the meeting. Id. at 97.

A few months after this meeting, on April 6, 2010, Mr. Lemon sent Plaintiff an email with the subject line, "Are You Thinking About Retirement?". Lemon Deposition, Exhibit 7, d/e 34-6 at 212. The email Superintendent Lemon forwarded advertised a free program about retirement offered by University of Illinois Extension. University of Illinois Extension sent Mr. Lemon the email that same day and it is undisputed that he then passed along the email to Plaintiff. Whether Mr. Lemon targeted the email to Plaintiff personally or forwarded it to many other employees is unclear. No personal message from Mr. Lemon to Plaintiff appears above the email that he forwarded to her. Curiously, there is no "TO" line in the copy of the email, but Defendant argues that Mr. Lemon would have forwarded this email to "many if not all employees in the district." Lemon Affidavit, d/e 49-3 ¶ 35.

In addition to this email and the conversation Plaintiff had with Mr. Lemon during their meeting, Plaintiff offers two more pieces of

evidence, the first of which is the lack of a remediation plan. Mr. Lemon explained in his deposition that if teachers or administrators were not meeting standards, the District would put them on a "formal remediation plan." This was "typical" after an employee received an unsatisfactory rating on an evaluation. Lemon Deposition, d/e 34-6 at 58. Though typical, this process was not automatic; Plaintiff was not put on a remediation plan after her unsatisfactory evaluation. She argues that no remediation plan was offered because the Central Office wanted her to retire instead. Additionally, Plaintiff insinuates that the high number of teachers retiring in 2010 supports her argument that the Central Office was trying to push her into retirement.

On May 13, 2010, just over one month after Mr. Lemon sent Plaintiff the email about the retirement program, Mr. Lemon sent Plaintiff and two other teachers an email congratulating them on winning "The Golden Apple Award." Lemon Deposition, Exhibit 8, d/e 34-6 at 214. Mr. Lemon described in his deposition that the Golden Apple Award is given to educators by a local television station that solicits nominations from parents, students, and community members. Id. at 108-09. Mr. Lemon explained that the reasons one is chosen for this

award "varies," but in his view, those who win it have done something "worthwhile" or "real meritorious." Id. at 108. Although Mr. Lemon agreed that such an award was a "noteworthy" accomplishment, he stated he did not recall whether Plaintiff had ever won a Golden Apple. Id. at 109. Mr. Lemon's email to Plaintiff and the other two award winners informed them that he planned to "recognize [their] achievement" at the school board meeting the following week. He stated they were welcome to attend and expected them to receive "a rich round of applause . . . ." Id. at 214.

In June of 2010, one month after this award recognition, the Irving School closed and Plaintiff's administrative contract ended. While applying for administrative positions in the District, Plaintiff began teaching students in grades six through twelve at the Adam County Juvenile Detention. Plaintiff's annual salary there was around $62,000.

### 3. Plaintiff's attempts to secure an administrative position

From 2010 to 2012, Plaintiff applied for the following positions in the District, all of which were given to people younger than Plaintiff:

1. June 2010: Assistant Principal at Quincy Junior High was given to Eryn Beswick, who was 32 years old.

2. February 2011: Assistant Principal at Quincy Junior High was given to Laurie Fiorenza, age 39.

3. January 2011: Christy Cox, age 36, got the position of Principal at Berrian Elementary. Plaintiff interviewed for this job.

4. March 2011: Principal of Quincy Junior High School was given to Daniel Sparrow, age 41. Plaintiff interviewed for this position as well.

5. March 2012: the position of Principal at Ballwin North Intermediate School went to Jason Fink, age 35.

6. Spring of 2012: Director of the Alternative School was a position given to Cheryl Dreasler, who was 53 years old when she was hired.

Defendant used a selection process comprised of screening tools, interviews, and recommendation committees to choose these candidates. See Sullivan-Viniard Deposition, d/e 34-4 at 7-10, 93; Dickens Deposition, d/e 34-5 at 11-20 (explaining hiring procedure). After a job description was released in the District, individuals would submit applications. For some of these positions, selected applicants would undergo a screening process in which trained administrators conducted

tests or used tools like the "principal perceiver" to evaluate the applicants. This "principal perceiver" was created by a company called Ventures for Excellence and included a coding sheet with prepared questions that trained administrators used to interview candidates.

Plaintiff, as well as Jason Fink and Daniel Sparrow, were all given this Ventures of Excellence interview when they applied for the principal position at Quincy High School. According to a deposition exhibit on which Defendant wrote some applicants' scores, Plaintiff scored an "11" and Daniel Sparrow and Jason Fink both scored a "16." Dickens Deposition, Exhibit 12, d/e 34-5 at 92. Ms. Dreasler, who later became Director of the Alternative School, was given a score of "15." Id. at 102. On the second page of Plaintiff's Venture of Excellence evaluation, Anne Cashman, the administrator who interviewed Plaintiff, predicted Plaintiff would be a "Moderate," rather than "Very High" or "Good" principal. Id. at 103; Sullivan-Viniard Deposition, d/e 34-4 at 27. Ms. Dickens explained in her deposition that these scores and evaluations were given around the spring of 2012 and would be used if the applicant applied for subsequent positions. Id. at 20.

Selected applicants would also have a first-round interview with a committee that would make recommendations to the Central Office. The committee members varied based on the position the District was seeking to fill. From these recommendations, the Central Office—in this case, Lemon, Sullivan-Viniard, and Dickens—would either bring in finalists for additional interviews or make a selection to present to the school board.

Plaintiff claims that with the exception of Ms. Dreasler, who was 53 years old when she became Director of the Alternative School, all of the individuals chosen for the positions Plaintiff wanted were much younger and less qualified than she was at the time. In her Response to Defendant's Motion for Summary Judgment, Plaintiff argues that Eryn Beswick, age 32, who had previously been a special education coordinator and special education teacher, lacked previous administrator experience when she was named assistant principal. Laurie Fiorenza, age 39, replaced Eryn Beswick, and Plaintiff claims that she too was a classroom teacher without administration experience. Christie Cox, age 36, received her administrator's certificate approximately six months before she was selected for the Principal position at Berrian Elementary

and had worked as an elementary school principal for one year. Jason Fink, age 35, was a principal from August 2010 to March 2012—a lesser term than Plaintiff's at Irving—before he was selected as Principal. And Daniel Sparrow, who was 41 years old when he was chosen as the Quincy Junior High Principal, was a principal and athletic coach for 5 years, but Plaintiff points out that unlike her, he had worked outside of the District.

The key players in the Central Office—Mr. Lemon, Ms. Sullivan-Viniard, and Ms. Dickens—all contend in their depositions and affidavits that Plaintiff's performance as Director of the Irving School worked against her efforts to obtain any of these positions. In addition to her negative evaluation, Defendant cites staff surveys in which staff noted that Plaintiff was "too lenient," "morale is low," and "students have the upper hand." Defendant's Reply to Plaintiff's Response, d/e 49 ¶ 39. These comments are only a sample of the comments from these staff surveys that both critique and praise Plaintiff's performance as Director. See Plaintiff's Response to Defendant's Motion for Summary Judgment, d/e 39, Exhibit F.

Defendant additionally argues that the people chosen for these positions had specific skills and experiences that made them better candidates than Plaintiff. Dan Sparrow, for example, impressed Ms. Dickens and Mr. Lemon with his reputation as an "excellent disciplinarian." Dickens Affidavit, d/e 34-3 ¶ 14; Lemon Affidavit, d/e 49-3 ¶ 31. Laurie Fiorenza had participated in the District's training of the Comprehensive Literacy Model, with which Jason Fink was likewise familiar, and the District, according to Mr. Lemon, was seeking to improve literacy rates. Lemon Affidavit, d/e 49-3 ¶ 9. Christy Cox had experience with K-3 curriculum and was formerly a literacy coach. Dickens Deposition, d/e 34-5 at 50. According to Anne Cashman, an elementary school principal in the District who interviewed Ms. Cox and Plaintiff, Ms. Cox was the "best candidate" for the Berrian Elementary School principal position. Cashman Affidavit, d/e 49-1 ¶ 10. In contrast, Ms. Cashman stated that Plaintiff's responses to the Ventures for Excellence questions were "brief" and that she did not appear "well-suited" for the position. Id. ¶¶ 18-19. Ms. Cashman also asserted in her affidavit that Ms. Dreasler was the "best fit" for the position of Director of the Alternative School. Id. ¶ 31. Danielle Edgar, the Principal at

Quincy High School, who was also involved in hiring some of these candidates, agreed that Ms. Dreasler was the "best fit" and had "new ideas," while Plaintiff's responses "did not make her stand out positively from the other candidates."  Edgar Affidavit, d/e 49-2 ¶¶ 12-14, 23. Jason Fink's familiarity with the Response to Intervention Model and his knowledge of professional learning communities and the "common core" were important considerations in his selection.  See Dickens Deposition, d/e 34-5 at 49-50.

## II.   JURISDICTION & VENUE

The Court has subject-matter jurisdiction because the cause of action arises under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq, which is a law of the United States. 28 U.S.C. § 1331.  Venue is proper in this Court because the actions giving rise to Plaintiff's claim took place in this judicial district and the Court has personal jurisdiction over Defendant, whose principal place of business is in Quincy, Illinois.  28 U.S.C. § 1391.

## III.   LEGAL STANDARD

Summary judgment is proper if the movant—here, Defendant— shows that there is no genuine issue of material fact and that Defendant

is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

Defendant now bears the initial responsibility of identifying the evidence

that demonstrates the absence of a genuine issue of material fact.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  No genuine issue of

material fact exists if no reasonable jury could find in favor of Plaintiff,

the nonmoving party.  See Brewer v. Bd. of Trs. of the Univ. of Ill., 479

F.3d 908, 915 (7th Cir. 2007).  When ruling on the Motion for

Summary Judgment, this Court must consider the facts in the light most

favorable to Plaintiff, the nonmoving party, and draw all reasonable

inferences in Plaintiff's favor.  See Woodruff v. Mason, 542 F.3d 545,

550 (7th Cir. 2008).

## IV.   ANALYSIS

The Age Discrimination in Employment Act of 1967 ("ADEA")

makes it unlawful for an employer to fail or refuse to hire, to discharge or

to discriminate against an employee "because of" the employee's age.  29

U.S.C. § 623(a)(1).  To succeed on a claim under the ADEA, an

employee must show that her age was not simply one reason for the

employer's adverse action, but that age was the "but-for cause." Gross v.

FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009) ("[T]he ordinary

meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act.").   An employee must prove discrimination using either the direct or indirect method of proof.  <u>See</u> <u>Ptasznik v. St. Joseph Hosp</u>., 464 F.3d 691, 695 (7th Cir. 2006).  Plaintiff here argues she can succeed under both methods.  Because the Court finds that Plaintiff has demonstrated Defendant is not entitled to summary judgment under the direct method, only that route is analyzed below.

1.  **Plaintiff has Shown Under the Direct Method of Proof that a Reasonable Juror Could Find Age Discrimination**

Proof under the direct method includes a "smoking gun," such as an explicit confession of discriminatory intent, or circumstantial evidence that shows a discriminatory motive through a chain of inferences.  <u>Hester v. Ind. State Dep't of Health</u>, 726 F.3d 942, 947 (7th Cir. 2013) (noting that direct evidence like an outright confession is uncommon "outside the world of fiction");  <u>Van Antwerp v. City of Peoria, Ill.</u>, 627 F.3d 295, 298 (7th Cir. 2010)(explaining that circumstantial evidence may establish an employer's discriminatory motive through a long chain of inferences).   Circumstantial evidence may take many forms, including

but not limited to: suspicious timing; ambiguous statements or behavior directed at other employees in the protected group; evidence that the employer treated employees outside the protected class who were similarly situated to the plaintiff employee more favorably; and evidence that an employee was qualified but passed over for a job in favor of one outside of the protected class and the employer's reason for doing so is pretextual.  See e.g., Hester, 726 F.3d at 947; Mullin v. Temco Mach., Inc., 732 F.3d 772, 776 (7th Cir. 2013) (finding that circumstantial evidence supported plaintiff's claim that he was fired because of his age).

Plaintiff seems to concede that she has not uncovered the ever-elusive "smoking gun" that would directly prove Defendant's alleged discriminatory animus.  Instead, Plaintiff argues that the Defendant's "mosaic of fishy and suspicious" actions establish the necessary animus required under the direct method of proof.  Defendant disagrees, arguing that the case on which Plaintiff relies for her assertion here, Cook v. Ill. Dept. of Corrections, is incomparable to her case.

Although the Cook plaintiff's experience at the Illinois Department of Corrections differs from Plaintiff's experience with the District, Plaintiff in this case has established a chain of inferences that, taken in

the light most favorable to Plaintiff, could lead a reasonable jury to find in her favor. Defendant argues that unlike the <u>Cook</u> plaintiff, Plaintiff here was not "constantly asked about her age and when she was going to retire." <u>See</u> Defendant's Reply to Plaintiff's Response, d/e 49 at 40 (citing <u>Cook</u>, 736 F.Supp.2d at 1197). However, the interactions Plaintiff had with Mr. Lemon from January 2010, when she received the negative evaluation, and June of 2010, when her contract expired and Irving closed, is enough circumstantial evidence to show direct evidence of age discrimination.

There is a genuine dispute about Mr. Lemon's intentions when asking Plaintiff whether she was planning on retiring before she received the negative evaluation. While Plaintiff interpreted Mr. Lemon's comments as suggestions that she retire, Mr. Lemon asserts that he does not remember asking her when she planned to retire and was innocently discussing the topic of retirement because he felt they were similarly situated. And while Plaintiff's impression of Mr. Lemon's comments may not raise a genuine factual dispute on their own, neither this Court nor a juror is required to dismiss Plaintiff's impression altogether and accept Mr. Lemon's claim that he was just making casual conversation.

See Nagle v. Vill. of Calumet Park, 554 F.3d 1106, 1117 (7th Cir. 2009) (noting that plaintiff's subjective impression about her qualifications, without more, did not show discriminatory intent). In short, a reasonable juror could agree with Plaintiff that Mr. Lemon's intention in discussing retirement in a meeting in which she intended to discuss her future goals—only weeks before giving her a negative review—was to suggest that she actually retire, due to her age. And at a minimum, there is a genuine issue of fact about whether Mr. Lemon ever asked Plaintiff when she was going to retire.

Even if Mr. Lemon was suggesting that Plaintiff retire, however, that alone is not enough for Plaintiff to survive summary judgment. See Kaniff v. Allstate Ins. Co., 121 F.3d 258, 263 (7th Cir.1997) (stating that "suggestion[s] of retirement do[ ] not rise to the level of direct evidence of age discrimination" if the employer has an alternative explanation for the adverse action). It is also not the only evidence Plaintiff presents. Mr. Lemon's comments came right before he created a damning evaluation that criticized Plaintiff for the high truancy rates, low test scores, and widespread behavior problems of students attending

Irving. These issues were prevalent in the evaluation, though many students are at Irving because of their previous problems with attendance, academics, and behavior. Neither party disputes that fact. And there is evidence in the record, including surveys from Irving staff and affidavits from Ms. Harris, the former Irving counselor, and Mr. Ellerman, the former principal at Quincy High School, that indicate this negative evaluation could have exaggerated Plaintiff's ability—or lack thereof—to resolve these problems. See Shager v. Upton Co., 913 F.2d 398, 401 (1990) (noting evidence that supervisor "greatly exaggerated" plaintiff's deficiencies could be evidence of pretext). Generally, testaments from supervisors or colleagues that corroborate a plaintiff's broad claims she was a stellar employee are insufficient to create a genuine issue of fact. Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124–25 (7th Cir. 1994) (finding affidavit by former supervisor and testimony of co-worker that plaintiff's performance was satisfactory and that plaintiff was not entirely responsible for mishaps insufficient to defeat summary judgment); Dey v. Colt Const. & Dev. Co., 28 F.3d 1446, 1460 (7th Cir. 1994) (same).

But in this case, Plaintiff vehemently contested the evaluation in a rebuttal she submitted to the Central Office, specifically refuting many if not all of the criticisms in the review. The affidavits of Mr. Ellerman and Ms. Harris corroborate some of these refutations, such as the students' use of profanity and poor performance on the annual exams. See Dey, 28 F.3d at 1460 (finding issues of fact when plaintiff submitted affidavits by coworkers that specifically refuted facts on which employer relied to show that plaintiff's performance was deficient). Because Plaintiff's performance at Irving is Defendant's primary justification for not hiring Plaintiff for any of the administrative positions, genuine issues of material fact about her performance preclude summary judgment.

Additionally, the District chose resignation over remediation when deciding how to handle Plaintiff's negative evaluation. Rather than place Plaintiff on a remediation plan after the negative evaluation, according to both parties, the District—either in correspondence or personally by Mr. Lemon—told Plaintiff she could resign. And apparently the District made that offer around the same time the Central Office knew Irving was closing. Defendant argues that this resignation offer is not evidence of discrimination because "[n]othing in this offer makes the slightest

reference to age." Defendant's Reply, d/e 49 at 41. Although the offer may not have contained an explicit reference to Plaintiff's age, a juror could reasonably infer that because older people retire more frequently than their younger colleagues, this offer implicitly referenced age. Why would the Central Office ask whether Plaintiff wanted to resign only months before they planned to close the school? Perhaps the District wanted to allow Plaintiff to save face and resign with dignity. See Kaniff v. Allstate Ins. Co., 121 F.3d at 263 (7th Cir. 1997) (noting possibility that defendant suggested retirement to plaintiff to spare plaintiff the embarrassment of being terminated for dishonesty). Perhaps the District wanted to ensure she would not be involved with the outsourced program. Perhaps Mr. Lemon was simply curious about Plaintiff's retirement plans. See Colosi v. Electri–Flex Co., 965 F.2d 500, 502 (7th Cir.1992) (finding that two inquiries about the employee's retirement shortly before the employee's termination was not direct evidence of age discrimination because an employer has a legitimate interest in learning its employees' plans for the future). A perfectly valid and legal explanation could exist if her performance really was deficient. It is also possible, however, that the explanation is more sinister. The Court need

not and cannot decide these issues on summary judgment, because they turn on the intent and credibility of Plaintiff and Mr. Lemon. See Darchak v. City of Chic. Bd. of Educ., 580 F.3d 622, 633 (7th Cir. 2009)("Employment discrimination cases often center on parties' intent and credibility, which must go to a jury unless no rational factfinder could draw the contrary inference.")(citations omitted).

One additional piece of evidence supports denial of Defendant's Summary-Judgment Motion: five out of the six administrative positions for which Plaintiff applied went to educators much younger than she, and a few with much less administrative experience. Because Plaintiff has survived summary judgment using the direct method of proof, she does not need to prove, at this stage, that the people chosen for the positions were not only younger but also less qualified. See, e.g., Atanus v. Perry, 520 F.3d 662, 672 (7th Cir. 2008) (explaining that plaintiff proceeding under indirect method must establish prima facie case of discrimination, including that those chosen for positions were younger and equally or less qualified). However, the ages and qualifications of those chosen six people versus Plaintiff are still relevant. See Hester, 726 F.3d at 947 (stating that evidence a qualified employee was passed over

for a younger person and that employer's reason is pretextual is one category of circumstantial evidence under direct method). With the exception of Cheryl Dreasler, those given the positions at issue in this case were significantly younger than Plaintiff. See Diaz v. Kraft Foods Global, Inc. 653 F.3d 582, 588 (7th Cir. 2011) (stating jury had to resolve question of whether defendant's decision to hire someone in same protected class as plaintiff negated discriminatory intent). And with the exception of Eryn Beswick, who Defendant concedes had "no previous administrator experience" when she was hired over Plaintiff as Assistant Principal of Quincy Junior High School, the parties dispute the qualifications of those chosen for the positions. Defendant's Reply, d/e 49 at 17. Neither the Court nor the jury should sit as a "super-personnel department" that scrupulously reviews all of an employer's hiring decisions. Wolf v. Buss (Am.) Inc., 77 F.3d 914, 920 (7th Cir. 1996) (internal citations omitted). The question is not: who would I, the juror, or I, the judge, choose for these positions? Rather, the inquiry on summary judgment is whether it is "genuinely contestable" that the District repeatedly declined to hire Plaintiff because of her age or an evaluation tainted by age discrimination. See Shager, 913 F.3d at 403

(reversing district court's grant of summary judgment to defendant after finding material issues of fact existed that only a jury could resolve). Plaintiff's performance as Director of Irving, the intentions, statements, and actions of Mr. Lemon in the winter and spring of 2010, and the qualifications of Plaintiff and others chosen for the position are all genuinely contestable issues for a jury to resolve.

Due to the emphasis Plaintiff's case places on the words and actions of Mr. Lemon, the Court will address one more argument Defendant has raised: "there is no evidence to indicate that Mr. Lemon personally took action to prevent Ms. Rein from being recommended for these positions due to her age." Defendant's Reply, d/e 49 at 42. Mr. Lemon was not the only person hiring or rejecting candidates for these six administrative positions, as other administrators, a hiring committee, and the School Board were all apparently involved. As Superintendent, however, he was involved in the hiring process and it is possible that he exerted some influence—either through the negative evaluation he gave Plaintiff or otherwise—on others involved in the decision-making process. In addition to determining whether Mr. Lemon had any discriminatory animus, another issue is whether any alleged animus influenced the

others involved in the decision-making process. Were the committee and the Board a "conduit, vehicle, or rubber stamp"? <u>Hill v. Potter</u>, 625 F.3d 998, 1002 (7th Cir. 2010). When viewing the evidence in the light most favorable to Plaintiff, the Court believes that a reasonable juror could answer "Yes" to this question. <u>Shager</u>, 913 F.2d at 406 (stating that whether committee that fired plaintiff was untainted or prejudiced by supervisor's animus was a question for trial); <u>see</u> <u>also</u> <u>Sun v. Bd. of Trustees of Univ. of Ill.</u>, 473 F.3d 799, 813 (7th Cir. 2007) (finding that numerous reviews by independent committees removed the possibility that alleged wrongdoer influenced defendant's decision to deny plaintiff tenure).

Because Plaintiff has shown under the direct method of proof that a reasonable juror could find in her favor, the Court will not address the likelihood of her success under the indirect method of proof.

## V. CONCLUSION

Genuine issues of material fact exist about Plaintiff's performance as Principal at Irving, the qualifications of those chosen for the administrative positions, the intentions, actions, and statements of Mr. Lemon in regards to Plaintiff, and Mr. Lemon's role in hiring for the

administrative positions.   Therefore, the Court DENIES Defendant's

Motion for Summary Judgment.

ENTERED: February 11, 2014

FOR THE COURT:

                              s/Sue E. Myerscough
                              SUE E. MYERSCOUGH
                              UNITED STATES DISTRICT JUDGE